IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
BEAUMONT DIVISION

| | | |
|---|---|---|
| JAYLON BIBBS, | § | |
| | § | |
| *Plaintiff*, | § | |
| | § | |
| v. | § | CIVIL ACTION NO. 1:23-CV-00315 |
| | § | JUDGE MICHAEL J. TRUNCALE |
| MOTIVA ENTERPRISES LLC, | § | |
| | § | |
| *Defendant*. | § | |
| | § | |

## ORDER DENYING PLAINTIFF JAYLON BIBBS'S MOTION FOR SUMMARY JUDGMENT AND GRANTING MOTIVA ENTERPRISES LLC'S MOTION FOR SUMMARY JUDGMENT

Before the Court is Plaintiff Jaylon Bibbs's Motion for Summary Judgment. [Dkt. 13] and Defendant Motiva Enterprises LLC ("Motiva")'s Motion for Summary Judgment [Dkt. 14]. For the following reasons, Bibbs's Motion is **DENIED**, and Motiva's Motion is **GRANTED**.

## I.    BACKGROUND

This suit is a disability discrimination case, where Plaintiff Bibbs alleges that Defendant Motiva discriminated against him based on his disability, subjected him to an improper medical examination, and retaliated against him because of his disability. *See* [Dkt. 1].

Motiva owns and operates an oil refinery in Port Arthur, Texas, which processes and distributes petrochemical products. [Dkt. 13 at 5]. Motiva needs employees called "Process Operators" to ensure that its operations comply with Motiva's safety, environmental, and operating policies and procedures. *Id.* Process Operators are vital to the company because "an Operator's error can range from compliance failures with environmental rules, to catastrophic outcomes for workers and surrounding communities." *Id.* Because of the job's high stakes, Motiva established a "formalized process for recruiting, interviewing, selecting, training, and evaluating Process Operators." *Id.* This process proceeds in the following stages: First, Motiva accepts applications and employs a class of trainees

based on panel interviews, where applicants are asked behavioral and technical questions. *Id.* Next, the trainees proceed to classroom training for approximately four weeks, where subject-matter experts lecture the class on different operations within the Refinery. *Id.* at 6. After each lecture, the trainees take a written examination that tests their understanding of the material, totaling sixteen exams over the course of the classroom training. *Id.* If a trainee fails, he or she may retake it, but upon multiple failed attempts, Motiva may terminate the employee. *Id.* The third phase consists of "field training," where one of five of Motiva's "business units" selects trainees to fill available roles. *Id.* During field training, trainees receive specialized training related to the unit's operations from a supervisor. *Id.* Field training typically begins with "parallel training" with a trainer, where the trainee works more independently as he or she gains experience. *Id.* at 7.  During parallel training, the trainee must pass certain checkpoints and pass a final hands-on test. *Id.* During the hands-on test, the trainee is observed and evaluated by the supervisor. *Id.* Once a trainee passes the hands-on test, he or she proceeds to "shadowing" (also known as "piggybacking") that involves operational tasks under an experienced operator. *Id.* During the field training, the supervisor may recommend that Motiva either terminate a trainee for failure to progress or suggest that the trainee is qualified to work entirely on his or her own. *Id.*

Bibbs was hired by Motiva in August 2022 as one of thirty individuals selected to be a part of the Process Operator class. [Dkt. 14 at 11]. Bibbs notified Motiva of a learning disability after he failed his first written examination during the classroom phase, where he requested that the tests be read aloud to him. *Id.* One of his trainers, Zachary Butler, informally granted Bibbs's request. *Id.* Butler then notified Heather Hicks in Motiva's Human Resources Department of Bibbs's accommodation request. *Id.* at 12. Hicks initiated the interactive process to determine whether Bibbs needed reasonable accommodations to perform the role of Process Operator. *Id.* Hicks connected Bibbs with Danny Credeur, a nurse practitioner for Motiva's Medical Department which oversaw the interactive process. *Id.* Credeur provided Bibbs with documentation to be completed by Bibbs and his healthcare provider.

*Id.* The documents were essentially needed by Motiva "to obtain information regarding Bibbs's specific, job-related limitations and any need for accommodations." *Id.* Bibbs later provided documentation completed by a family nurse practitioner, Tiffany Larnette, who indicated that Bibbs had dyslexia and needed assistance with learning and "grasping information," indicating he would need testing-related accommodations. *Id.* When asked whether any limitation interfered with Bibbs's ability to perform the essential functions of his job, Larnette said "None." [Dkt. 13 at 10]. Larnette indicated to Credeur that her documentation was not based on any determinations she made herself, but relied on what Bibbs told her. [Dkt. 14 at 13]. Motiva provided Larnette with follow-up questions to obtain additional information about his ability to perform essential job functions and any reasonable accommodations he may need. *Id.* Larnette indicated that Bibbs would need accommodations "to avoid distractions that would inhibit [his] thought process." *Id.* She declined to answer whether Bibbs can read and interpret procedures in emergency and non-emergency situations without risking harm to himself for others. *Id.*

While the interactive process was underway, Motiva allowed Bibbs to proceed through his training. *Id.* Bibbs successfully completed all sixteen exams and proceeded to field training as a "Pumper" with the Logistics Business Unit, which operates and manages product transport. [Dkt. 13 at 8]. Motiva assigned Bibbs to the Loading Rack, where Bibbs learned how to operate a computerized system to input information and initiate the transfer of product for transport. *Id.* Bibbs worked under supervisor Shannon Stanley and trainer Mark Segura. *Id.* at 9. On October 13, 2022, Bibbs attempted his final hands-on test, which Stanley observed. *Id.* Bibbs made a mistake by going out of sequence and entering information into the computer and pushing start before setting up the loading pump, a mistake for which Segura had to immediately intervene. *Id.*; [Dkt. 14 at 15]. Without Segura's intervention, Bibbs's mistake would have caused a chemical spill. [Dkt. 14 at 15]. After the incident, Segura told Stanley that Bibbs told him of his learning disability and that there was a "noticeable gap" between Bibbs's ability to learn the rack position and that of another trainee. *Id.* at 16. Stanley reported

the incident and his conversation with Segura to his supervisor, Kristen Reckart, who then escalated it to Hicks. *Id.* Bibbs ultimately successfully completed the hands-on test and Stanley still recommended that Bibbs continue his training and employment with Motiva. [Dkt. 13 at 9]. Bibbs then proceeded to the "piggybacking" stage of training and continued receiving positive feedback from his superiors. *Id.* at 9–10. Bibbs completed each step in the hands-on training absent any accommodation. *Id.* at 10.

On October 20, 2022, Motiva Medical informed Bibbs that he would need to be evaluated by a third-party medical specialist based on a need to obtain more information related to his disability, accommodations, and whether he could perform the essential functions of his job. [Dkt. 14 at 16–17]. Bibbs then attempted to withdraw his accommodation request, which Motiva declined. *Id.* at 16. Motiva Medical sent Bibbs to Dr. Michael Knox, a clinical psychologist specializing in cognitive disorders, for an independent evaluation. *Id.* at 17. On November 3, 2022, Dr. Knox conducted hours of psychological and cognitive testing, concluding that Bibbs be provided with "continued accommodations" with reading, "additional training supervision when learning new tasks," and "additional supervision until he demonstrates mastery over a procedure." *Id.* at 17–18. Dr. Knox summarized his evaluation by stating that Bibbs functions "best in a routine, repetitive, and structured environment" and that he "would be hesitant to place him in a role that could potentially result in significant injury to himself for others." *Id.* at 18. He further concluded that Bibbs "would also likely have difficulties processing complex information quickly [in] both normal and in high pressure situations such as emergencies." *Id.*

Upon receiving Dr. Knox's evaluations, Credeur prepared a summary of proposed accommodations and Motiva determined that the business would be unable to grant them. *Id.* at 18. Neither Hicks nor Bibbs could identify an alternative solution or find open positions for which Bibbs was qualified, with or without reasonable accommodations. *Id.* at 19. Thus, Motiva officially terminated Bibbs on November 23, 2022. *Id.* On November 29, 2022, Bibbs obtained other employment. *Id.*

Bibbs filed the present lawsuit on August 21, 2023. [Dkt. 1]. On July 22, 2024, Bibbs and Motiva each moved for summary judgment. [Dkts. 13, 14]. The Parties have filed their responsive briefs. [Dkts. 16, 22]. The Motions are ripe for review.

## II.    LEGAL STANDARD

Under Federal Rule of Civil Procedure 56, "[s]ummary judgment is proper when the pleadings and evidence demonstrate that no genuine issue of material fact exists, and the movant is entitled to judgment as a matter of law." *DIRECTV, Inc. v. Robson*, 420 F.3d 532, 536 (5th Cir. 2005); Fed. R. Civ. P. 56(c). "An issue is material if its resolution could affect the outcome of the action." *DIRECTV*, 420 F.3d at 536. "A dispute as to a material fact is genuine if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* All reasonable inferences must be drawn in favor of the nonmoving party. *Smith v. Amedisys Inc.*, 298 F.3d 434, 440 (5th Cir. 2002). There is no genuine issue of material fact if, when the evidence is viewed in the light most favorable to the nonmoving party, no reasonable trier of fact could find for the nonmoving party. *Int'l Shortstop, Inc. v. Rally's, Inc.*, 939 F.2d 1257, 1263–64 (5th Cir. 1991) (citations omitted). When parties file cross-motions for summary judgment, as here, a court must "examine 'each party's motion independently' and view 'the evidence and inferences in the light most favorable to the nonmoving party.'" *Springboards To Educ., Inc. v. Hous. Indep. Sch. Dist.*, 912 F.3d 805, 811 (5th Cir. 2019) (quoting *JP Morgan Chase Bank, N.A. v. Data Treasury Corp.*, 823 F.3d 1006, 1011 (5th Cir. 2016)).

## III.    DISCUSSION

Motiva's Motion raises two primary issues: (1) whether Motiva discriminated against Bibbs in violation of the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12101 *et seq.*, and Texas Commission on Human Rights Act ("TCHRA"), Tex. Lab. Code § 21.001 *et seq.*, and (2) whether Bibbs failed to exhaust his retaliation claim, or in the alternative, whether Bibbs's retaliation claim

fails as a matter of law.[1] [Dkt. 14 at 8–10]. Bibbs's Motion raises whether Motiva subjected Bibbs to an improper medical examination.[2] [Dkt. 13 at 4]. Because both Motiva and Bibbs discuss whether there is a genuine question of material fact as applied to the improper medical examination claim and the Parties' briefings substantially overlap on the issue, the Court addresses both Motions together.

For the following reasons, the Court **DENIES** Bibbs's Motion for Summary Judgment and **GRANTS** Motiva's Motion for Summary Judgment.

### A. Disability Discrimination

"The ADA prohibits an employer from discriminating against a 'qualified individual with a disability on the basis of that disability.'" *E.E.O.C. v. LHC Grp., Inc.*, 773 F.3d 688, 694 (5th Cir. 2014) (quoting 42 U.S.C. § 12112(a)). Similarly, the TCHRA states that "[a]n employer commits an unlawful employment practice if because of . . . disability . . . the employer[] . . . discharges an individual[] or discriminates in any other manner against an individual in connection with . . . employment." Tex. Lab. Code § 21.051(1). Disability discrimination claims under Texas law are essentially analogous to disability discrimination claims under the ADA. *See Dillard v. City of Austin*, 837 F.3d 557, 561 (5th Cir. 2016) ("As Texas courts interpret their state's disability legislation so as to mirror the federal statute, our analysis of [the plaintiff's] ADA claims will determine the disposition of his state claims as well." (citations omitted)); *see also* Tex. Lab. Code § 21.001(3) (stating that one of the general purposes of the TCHRA is to "provide for the execution of the policies embodied in Title I of the Americans with Disabilities Act of 1990 and its subsequent amendments"). Thus, the Court's use of ADA law and interpretation may be applied to the TCHRA and vice versa.

---

[1] Motiva also moved the Court to limit Bibbs's damages. [Dkt. 14 at 9–10]. The Court does not address the damages issue because it grants Motiva's motion for summary judgment in full and dismisses the case, meaning that Bibbs is not entitled to damages.

[2] Bibbs's Motion for Summary Judgment is a motion for partial summary judgment, as he requests summary judgment on only one of his claims, and not the others. [Dkt. 13 at 4 n.1] ("Mr. Bibbs does not request summary judgment on his . . . claims under the ADA and Texas Labor Code for discrimination and retaliation.").

Here, Bibbs alleges that Motiva discriminated against him by (1) subjecting him to an improper medical examination and (2) terminating his employment because of a disability. [Dkt. 1 at 8].

i.    **Improper Medical Examination**

"[A] prohibited medical examination or inquiry may constitute a form of employment discrimination under the ADA." *Taylor v. City of Shreveport*, 798 F.3d 276, 282 (5th Cir. 2015) (citing 42 U.S.C. § 12112(d)(1)). The ADA prohibits an employer from "using qualification standards, employment tests[,] or other selection criteria that screen out or tend to screen out an individual with a disability." 42 U.S.C. § 12112(b)(6). The prohibition against discrimination "include[s] medical examinations and inquiries." *Id.* § 12112(d)(1). An employer must not "require a medical examination and shall not make inquiries of an employee as to whether such employee is an individual with a disability or as to the nature or severity of the disability, unless such examination or inquiry is shown to be job-related and consistent with business necessity." *Id.* § 12112(d)(4)(A); *see also* 29 C.F.R. § 1630.13(b) ("[I]t is unlawful for a covered entity to require a medical examination of an employee or to make inquiries as to whether an employee is an individual with a disability or as to the nature or severity of such disability."). "Generally, 'Section 12112(d)(4)(A) prohibits employers from using medical exams as a pretext to harass employees or to fish for nonwork-related medical issues and the attendant "unwanted exposure of the employee's disability and the stigma it may carry."'" *Franklin v. City of Slidell*, 936 F. Supp. 2d 691, 712 (E.D. La. 2013) (quoting *Brownfield v. City of Yakima*, 612 F.3d 1140, 1140 (9th Cir. 2010) (citing *EEOC v. Prevo's Fam. Mkt., Inc.*, 135 F.3d 1089, 1094 n.8 (6th Cir. 1998))). The Fifth Circuit has provided little precedent and guidance in interpreting § 12112(d)(4)(A). *EEOC v. Gulf Logistics Operating, Inc.*, 371 F. Supp. 3d 300, 312 (E.D. La. 2019) (listing cases). Therefore, the Court seeks guidance from the EEOC, district courts within the Fifth Circuit, and our sister circuits.

### a.   Prima Facie Case

"A plaintiff asserting a claim under § 12112(d)(4)(A) 'must show (1) that he is an employee of the defendant-employer, and (2) that the defendant-employer required him to undergo a medical examination or made a disability-related inquiry of him.'" *Burns v. Nielsen*, 456 F. Supp. 3d 807, 821–22 (W.D. Tex. 2020) (quoting *Williams v. FedEx Corp. Servs.*, 849 F.3d 889, 901 (10th Cir. 2017) (applying the standards articulated in § 12112(d)(4)(A) to § 501 of the Rehabilitation Act, which incorporates by reference § 12112(d)(4)(A)). As defined by the EEOC, a "medical examination" is a "procedure or test that seeks information about an individual's physical or mental impairments or health." U.S. Equal Emp. Opportunity Comm'n, Notice No. 915.002, Enforcement Guidance: Disability-Related Inquiries and Medical Examinations of Employees Under the Americans with Disabilities Act (ADA) (2000), 2000 WL 33407181, at *3 [hereinafter "EEOC Enforcement Guide"].[3] Additionally, a "disability-related inquiry" is defined by the EEOC as "a question (or series of questions) that is likely to elicit information about a disability." *Id.* Here, Bibbs was an employee[4] of

---

[3] The EEOC Enforcement Guide was written prior to the enactment of the Americans with Disabilities Act Amendments Act of 2008 (ADAAA). The ADAAA expanded the statutory definition of "disability," meaning that it did not affect interpretation of the improper medical examination or inquiry under § 12112(d)(4)(A). *See, e.g.*, *Neely v. PSEG Tex., L.P.*, 735 F.3d 242, 245 (5th Cir. 2013). Therefore, the Court finds that it is still of persuasive value and joins other courts that have used it for guidance. *See Burns*, 456 F. Supp. 3d at 823; *Berger v. N.Y. Police Dep't*, 304 F. Supp. 3d 360, 372–73 (S.D.N.Y. 2018); *Vinson v. Grant/Riverside Methodist Hosp.*, No. C2-99-1358, 2001 WL 1681125, at *7 (S.D. Ohio Aug. 30, 2001).

[4] Motiva does not appear to dispute that Bibbs was an employee of Motiva. *See* [Dkt. 14 at 11 ("Bibbs was hired by Motiva in August 2022 as part of a 30-person operator class.")]. If Motiva argued that he was not an employee, § 12112(d)(4)(A) would be the improper form of relief, as the ADA prohibits certain employer conduct based on the plaintiff's employment status. *See* 42 U.S.C. § 12112(d)(2) (preemployment examinations); *id.* § 12112(d)(3) (employment entrance examinations); *id.* § 12112(d)(4)(A) ("A covered entity shall not require a medical examination and shall not make inquiries *of an employee* as to whether such employee is an individual with a disability or as to the nature or severity of the disability, unless such examination or inquiry is shown to be job-related and consistent with business necessity.") (emphasis added). Bibbs's offer of employment was "conditional upon Bibbs satisfying pre-employment requirements of Motiva." [Dkt. 13-1 at 45 (offer letter)]. These pre-employment conditions included being fully vaccinated for COVID-19, completion of a background screening, completion of a drug test and medical history questionnaire, obtaining government approval or license required for the job, and a fitness-to-work examination. *Id.* at 46. Motiva's process operator training program does not appear to be a part of the pre-employment conditions, and the Parties do not assert as much. In fact, during Bibbs's deposition, he described a pre-employment test as a "mechanical test." *Id.* at 18. Therefore, the Court concludes that Bibbs was an employee at the time Motiva required him to undergo a medical examination.

Motiva as a Process Operator Trainee, and Motiva required him to undergo a medical examination or disability-related inquiry[5] when it sent Bibbs to Dr. Knox for a neuropsychological evaluation. [Dkt. 13 at 17]. The next question, therefore, is whether Motiva can demonstrate that the examination or inquiry is job-related and consistent with business necessity." 42 U.S.C. § 12112(d)(4)(A); *see also* 29 C.F.R. § 1630.13(b).

### b. Job-Related and Consistent with a Business Necessity Defense

Demonstrating that a medical examination or inquiry was job-related or consistent with business necessity is an affirmative defense, meaning that the employer-defendant has the burden of demonstrating it. *See Burns*, 456 F. Supp. 3d at 822; *see also Brownfield*, 612 F.3d at 1146 ("The employer bears the burden of demonstrating business necessity."). In requiring an employee to undergo a medical inquiry or examination, "the employer has the burden of showing that the exam is job-related and that 'the asserted "business necessity" is vital to the business and the request for a medical examination or inquiry is no broader or more intrusive than necessary.'" *Parker v. Crete Carrier Corp.*, 839 F.3d 717, 722 (8th Cir. 2016) (quoting *Thomas v. Corwin*, 483 F.3d 516, 527 (8th Cir. 2007); *see also Kroll v. White Lake Ambulance Auth.*, 763 F.3d 619, 623 (6th Cir. 2014); *Burns*, 456 F. Supp. 3d at 822. This "standard is quite high, and is not [to be] confused with mere expediency." *Conroy v. N.Y. Dep't Corr. Servs.*, 333 F.3d 88, 97 (2d Cir. 2003) (quoting *Cripe v. City of San Jose*, 261 F.3d 877, 890 (9th Cir. 2001) and citing *Tice v. Centre Area Transp. Auth.*, 247 F.3d 506, 515 (3d Cir. 2001); *Sullivan v. River Valley Sch. Dist.*, 197 F.3d 804, 811 (6th Cir. 1999)).

"Whether the medical inquiry was 'job-related and consistent with business necessity' is an 'objective' inquiry." *Burns*, 456 F. Supp. 3d at 822 (citing *Hannah P. v. Coats*, 916 F.3d 327, 339 (4th Cir. 2019); *Tice*, 247 F.3d at 518; *Brownfield*, 612 F.3d at 1146). In relying only on objective evidence,

---

[5] Motiva does not dispute that it sent Bibbs for a medical examination or disability-related inquiry, as it acknowledges that it was within its rights to require an independent examination to determine if he could perform the essential functions of his role. [Dkt. 14 at 20].

a court must not rely on "generalized assumptions and . . . personal belief[s]" that reveal the employer's subjective motivations for making a medical inquiry. *Burns v. Nielsen*, 506 F. Supp. 3d 448, 479 (W.D. Tex. 2020) [hereinafter "*Burns II*"] (citing *Bates v. Dura Auto. Sys., Inc.*, 767 F.3d 566, 582 (6th Cir. 2014)). Courts may "readily find business necessity and job-relatedness when the examination is clearly linked to a physical attribute or skill needed to perform a job, such as an employee who must take a weight-lifting exam for a pipefitting job." *Parker v. Pulte Homes Tex.*, Civil Action No. H-09-2743, 2011 WL 767182, at *9 (S.D. Tex. Feb. 25, 2011) (citing *Fuzy v. S&B Eng'rs & Constructors, Ltd.*, 332 F.3d 301, 303 (5th Cir. 2003)). "Courts have also found these criteria met when the examination or inquiry are triggered by concerns over whether an employee's own mental or physical health threatens their ability to perform their job safely for themselves or others." *Id.* (collecting cases).

"A disability-related inquiry of an employee may be job-related and consistent with business necessity 'when an employer has a reasonable belief, based on objective evidence, that: (1) [the] employee's ability to perform essential job functions will be impaired by a medical condition; or (2) [the] employee will pose a direct threat due to a medical condition.'" *Burns II*, 506 F. Supp. 3d at 479 (alterations in original) (quoting EEOC Enforcement Guide, 2000 WL 33407181, at *6). Furthermore, "[d]isability-related inquiries and medical examinations that follow up on a request for reasonable accommodation when the disability or need for accommodation is not known or obvious also may be job-related and consistent with business necessity." EEOC Enforcement Guide, 2000 WL 33407181, at *6; *see also Kroll*, 763 F.3d at 623 (listing the three ways in which a disability-related inquiry or examination may be job-related and consistent with a business necessity under the ADA); *Hannah P.*, 916 F.3d at 339 (same); *Delson v. Mineta*, 144 F. App'x 136, 138 (2d Cir. 2005) ("In seeking to determine the extent and types of accommodation that were truly necessary for plaintiff, the defendant's inquiries were 'job-related and consistent with business necessity.'").

In the Court's research, not many cases in the United States have analyzed the situation presented here, namely, whether an employer's request for documentation and subsequent independent

medical exam by a third party in response to a current employee's request for a reasonable accommodation constituted an improper disability-related inquiry or examination. The Southern District of New York found that the defendant's request for a disability-related medical examination was job-related and consistent with business necessity because it sought to determine the extent and types of accommodations necessary for the plaintiff. *Berger*, 304 F. Supp. 3d at 372–73 (citing *Delson*, 144 F. App'x at 138). Additionally, the District of Montana found that the defendant was entitled to summary judgment because the proposed medical examination was job-related and consistent with a business necessity. *Hamilton v. GlaxoSmithKline, LLC*, 414 F. Supp. 3d 1286, 1299 (D. Mont. 2019), *aff'd* 835 F. App'x 936 (9th Cir. 2021). More specifically, the defendant-employer turned to a third-party to "determine whether, when, and under what conditions [the plaintiff] would be able to return to work, as the diagnosis of gastritis [by the plaintiff's doctor as a basis for her proposed accommodation] did not support her extended absence." *Id.* The Court ultimately concluded that the scheduled examination was a business necessity because there was "no doubt" that the plaintiff's supervisors' ultimate purpose was to determine whether the plaintiff could perform the essential functions of her job. *Id.*; *see also Vinson*, 2001 WL 1681125, at *8 (concluding that the hospital-employer was justified in ordering an allergy examination to determine the extent of the plaintiff's allergy to formaldehyde "so that it could make a determination on how best to accommodate her" after she had been routinely accommodated since she first discovered her allergy over fifteen years prior to the ordered test).

The Court next turns to guidance from the EEOC. An employer may require documentation "that is sufficient to substantiate that s/he has an ADA disability and needs the reasonable accommodation requested." EEOC Enforcement Guide, 2000 WL 33407181, at *10. The employee's documentation is sufficient if it (1) "describes the nature, severity, and duration of the employee's impairment, the activity or activities that the impairment limits, and the extent to which the impairment limits the employee's ability to perform the activity or activities" and (2) "substantiates why the

requested reasonable accommodation is needed." *Id.* If the documentation is insufficient to substantiate that the employee has a disability and needs an accommodation, "[t]he ADA does not prevent an employer from requiring an employee to go to an appropriate health care professional of the employer's choice." *Id.* at 11. Documentation is insufficient when (1) "it does not specify the existence of an ADA disability and explain the need for reasonable accommodation," (2) "the health care professional does not have the expertise to give an opinion about the employee's medical condition and the limitations imposed by it," (3) "the information does not specify the functional limitations due to the disability," or, (4) "other factors indicate that the information provided is not credible or is fraudulent." *Id.* A medical examination conducted by the employer's health care professional "must be limited to determining the existence of an ADA disability and the functional limitations that require reasonable accommodation." *Id.*

Here, Bibbs argues that Motiva improperly subjected him to a medical examination because he disclosed his learning disability, creating a reasonable inference of disability discrimination. [Dkt. 13 at 17]. In contrast, Motiva argues that was within its rights to require a medical examination and that the examination was job-related and consistent with a business necessity. [Dkt. 14 at 8]. The Court agrees with Motiva.

The record demonstrates that Bibbs first requested an informal accommodation after he failed his first written examination.[6] [Dkt. 14-5 at 2]. He disclosed to Zachary Butler, Motiva's Learning Supervisor, that he had dyslexia and requested that the written examinations be read aloud to him, which was granted. *Id.* This was the first *recorded* instance of Bibbs disclosing any disability or need

---

[6] Both Parties produced Bibbs's written accommodation request. [Dkt. 13-1 at 53–54; Dkt. 14-9 at 2–3]. Bibbs dated the document January 23, 2022, which is long before Bibbs requested an accommodation during the classroom training phase in August 2022. [Dkt. 13-1 at 54; Dkt. 14-9 at 3]. The Court concludes that this date was likely a typographical error, as Bibbs did not apply for his job as a Process Operator until April 25, 2022 [Dkt. 13-1 at 43], and he does not assert that Motiva requested accommodation documentation before his first failed written examination [Dkt. 13 at 10].

for accommodation.[7] [Dkt. 14 at 11]. Butler notified Hicks from Motiva's Human Resources Department of the accommodation request, and Hicks commenced the interactive process to determine whether and to what extent Bibbs needed accommodations. [Dkt. 14 at 12; Dkt. 14-7 at 22]. As part of the interactive process, Motiva provided documentation to be filled out by Bibbs and his healthcare provider to obtain information about any potential need for accommodation and job-related limitations. [Dkt. 14 at 12]. Bibbs's family nurse practitioner, Tiffany Larnette, prepared the forms, indicating that Bibbs was "substantially limited" in "learning" and that an "accommodation may be needed requiring writing [and] reading during test[s]." [Dkt. 14-9 at 5]. When asked whether the disability interferes with Bibbs's ability to perform his job functions, Larnette noted "None," and suggested that he would need "accommodations with testing" to "assist [him] with grasping information." *Id.* at 6. After receiving Bibbs's documentation, Credeur met with Larnette, who indicated to Credeur that Bibbs "reported difficulty with 'comprehending information' when under pressure." [Dkt. 14-8 at ¶ 14]. Larnette never treated Bibbs for his disability [Dkt. 14-7 at 34], and it appears that she did not make any of these determinations herself, basing her notations on what Bibbs reported to her. [Dkt. 14-8 at ¶ 14]. Motiva sent follow-up documents to Larnette. [Dkt. 14-10]. As related to cognitive function, Larnette indicated that Bibbs needed help "grasping information" as applied to accommodations with testing "to avoid distractions that would inhibit his thought process." *Id.* at 4. In her medical opinion, Larnette believed that Bibbs would be "[a]ble to perform his job safely without work restrictions." *Id.* at 3. However, Larnette did not provide an answer when asked if Bibbs would be able to "read and interpret procedures, including in non-emergency and emergency situations . . . . without potential harm to himself or others." *Id.* at 4. As a result, "Motiva [] disagree[d] with [Larnette] who . . . provided

---

[7] Bibbs supposedly disclosed his dyslexia to his interview panel. [Dkt. 14-5 at 2]. Shannon Stanley, Bibbs's later-supervisor, was on his interview panel and declared that he did not hear Bibbs disclose any learning disability or need for accommodation. [Dkt. 14-3 at ¶ 4]. Even if Bibbs made that statement during his interview, Bibbs does not dispute Motiva's characterization of Bibbs's disclosure in his response. [Dkt. 22].

documentation that [Bibbs could] perform job duties." [Dkt. 23-1 at 2 (email from Danny Credeur)]. Motiva became "concerned that [Bibbs] would not be able to perform job duties due to dyslexia." *Id.*

The Court finds that this information alone justified Motiva's decision to send Bibbs to Dr. Knox for an independent medical evaluation. Larnette—a family nurse practitioner who did not treat Bibbs for his disability and based her conclusions on what Bibbs reported—did not provide Motiva with a clear understanding of Bibbs's disability. Initially, she indicated that Bibbs only needed accommodations related to testing. [Dkt. 14-9 at 5]. Later, she indicated to Credeur that he needed help "comprehending information" when under pressure. [Dkt. 14-8 at ¶ 14]. Upon further requests for documentation, Larnette declined to answer whether Bibbs could read and interpret procedures in emergency situations. [Dkt. 14-10 at 4]. EEOC guidance indicates that the ADA does not prohibit an employer from requiring an independent medical examination when documentation is insufficient, such as when the documentation "does not specify the existence of an ADA disability and explain the need for reasonable accommodation," or "the health care professional does not have the expertise to give an opinion about the employee's medical condition and the limitations imposed by it." EEOC Enforcement Guide, 2000 WL 33407181, at *11. Furthermore, like the defendants in *Berger*, *Hamilton*, and *Vinson*, Motiva sent Bibbs to Dr. Knox to determine the extent and types of accommodations, if any, Bibbs needed to perform the essential functions of his job as a Process Operator. *See Berger*, 304 F. Supp. 3d at 372–73; *Hamilton*, 414 F. Supp. 3d at 1299; *Vinson*, 2001 WL 1681125, at *8. Considering that Motiva's facilities are "very dangerous," Motiva wanted to know why Bibbs's accommodation request only applied in a testing environment when not reading a procedure correctly or needing help in an emergency could greatly endanger other employees and the community. [Dkt. 13-1 at 101 (Hicks Deposition); Dkt. 14-3 at ¶ 9 (Declaration of Shannon Stanley stating that the Pumper position "is a safety-sensitive position that requires an ability to read and comprehend written procedures and other technical and complex information quickly and effectively,

14

including in high-pressure, emergency situations"].[8] Thus, the Court finds that Motiva's decision to send Bibbs to Dr. Knox in connection with his accommodation was job-related and consistent with a business necessity.

The Court also finds that Dr. Knox's examination was consistent with the ADA and EEOC guidance. A medical examination conducted by the employer's health care professional "must be limited to determining the existence of an ADA disability and the functional limitations that require reasonable accommodation." EEOC Enforcement Guide, 2000 WL 33407181, at *11. Here, Dr. Knox is an independent clinical neuropsychologist that specializes in cognitive disorders. [Dkt. 14-8 at ¶ 19; Dkt. 14-15 at 3]. Dr. Knox performed several psychological tests and found, among other things, that Bibbs's processing speed was "low average on a sequencing task and fell to the mild to moderately impaired when set shifting demands were added," "[p]roblem solving and concept formation were below expectations," and that Bibbs "would also likely have difficulties processing complex information quickly [in] both normal and in high pressure situations such as emergencies." [Dkt. 14-15 at 4–5, 7]. The Court finds that Motiva's request for a disability-related medical examination with Dr. Knox was job-related and consistent with business necessity because it sought to determine the extent and types of accommodations necessary for Bibbs to perform the essential functions of his job, namely whether he could interpret procedures in high-pressure emergencies. *See* 42 U.S.C. §12112(d)(4)(A); *Berger*, 304 F. Supp. 3d at 372–73; *Hamilton*, 414 F. Supp. 3d at 1299; *Vinson*, 2001 WL 1681125, at *8.

Accordingly, the Court grants summary judgment in favor of Motiva on the issue of improper medical examination.

---

[8] Not to mention that Bibbs's mistake during his hands-on test could have caused a loss of primary contaminant ("LOPC"), a safety and environmental hazard. [Dkt. 14-12 at 2]. The Court notes, however, that Hicks admitted in her deposition that Bibbs was not sent to Dr. Knox because he failed the hands-on test, rather to acquire additional information to determine if Motiva could accommodate Bibbs. [Dkt. 13-1 at 123].

### ii.    Discriminatory Termination[9]

An employee may proceed with a discrimination-termination claim under the ADA (and by extension, the TCHRA) by presenting either "direct evidence that she was discriminated against because of her disability" or, absent direct evidence of discriminatory intent, by conducting "the burden-shifting analysis" articulated in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). *LHC Grp., Inc.*, 773 F.3d at 694. The latter analysis requires the plaintiff to establish a prima facie case of discrimination. *Id.* If the plaintiff is successful, the burden shifts to the defendant to "articulate a legitimate, nondiscriminatory reason for terminating" the plaintiff. *Id.* If articulated, the burden shifts back to the plaintiff to demonstrate that the defendant's reason is pretextual. *Id.* At the summary judgment stage, "a prima facie case of discrimination plus a showing that the proffered reason is pretextual is typically enough to survive summary judgment." *Id.* (citation omitted).

### a.  Direct Evidence

Direct evidence is "evidence which, if believed, proves the fact without interference or presumption." *Clark v. Champion Nat'l Sec., Inc.*, 952 F.3d 570, 579 (5th Cir. 2020) (quoting *Brown v. E. Miss. Elec. Power Ass'n*, 989 F.2d 858, 861 (5th Cir. 1993)). "A statement or document which shows on its face that an improper criterion served as a basis—not necessarily the sole basis, but a basis—for the adverse employment action [is] direct evidence of discrimination." *Id.* (internal quotations and citations omitted). Such evidence must "directly and expressly link[] [the plaintiff's] disability to a decisionmaker's choice to terminate him," rather than show "generalized knowledge about his [disability] and the termination." *Id.* at 580–81. Any generalized knowledge "would require [the Court] to make an inference." *Id.* at 581.

---

[9] In his response, Bibbs asserts that he "brings a disparate treatment claim under the ADA." [Dkt. 22 at 34]. However, the remainder of his argument expressly references his termination [Dkt. 22 at 34–35], and his complaint does not allege a claim of disparate treatment, rather discriminatory termination. [Dkt. 1 at ¶ 40] ("Motiva discriminated against Mr. Bibbs by terminating his employment because of a disability[.]"). Thus, the Court proceeds with a discriminatory termination analysis.

Here, Bibbs argues that the burden-shifting framework should not apply because Motiva "readily admits that it terminated Mr. Bibbs based on a disability." [Dkt. 22 at 35]. Bibbs offers evidence of an email from Motiva's Human Resources that stated: "Based on Dr. Knox's findings and recommendations, we regret to inform you that we have determined that you are not fit for duty in the Pumper Trainee position, and that there are no reasonable accommodations that can be provided for you[.]" [Dkt. 22-1 at 180]. While Motiva argues that its decision was based on a lawful medical examination, Bibbs states that this should be considered direct evidence of discriminatory intent because "[i]f Motiva unlawfully subjected Mr. Bibbs to the neuropsychological evaluation and unlawfully relied on the evaluation's results, then the subsequent termination is naturally unlawful." [Dkt. 22 at 35]. Motiva concedes that Bibbs's logic is correct in that the medical examination is issue-determinative because it revealed that Bibbs "could not, with or without reasonable accommodation, perform the essential functions of his job." [Dkt. 26 at 8].

As discussed above, Motiva did not unlawfully submit Bibbs to a medical inquiry or examination. Furthermore, contrary to Bibbs's assertion, Motiva did not say that it was terminating Bibbs *because he was disabled*. Rather, Motiva said that it was terminating Bibbs because it determined that Bibbs was not fit for duty and that it could provide no reasonable accommodation based on Dr. Knox's findings. [Dkt. 22-1 at 180]. A case from the Western District of Texas reached a similar conclusion. There, the employer admitted "that it restricted [the plaintiff] because it determined he [could not] safely perform his job's essential functions," not that it restricted the plaintiff because he was disabled. *Vasquez v. Union Pac. R.R. Co.*, No. 5-22-CV-00478-OLG-RBF, 2024 WL 4312257, at *5 (W.D. Tex. Aug. 26, 2024), *report and recommendation adopted* 2024 WL 4314952 (W.D. Tex. Sept. 23, 2024) (employee was subjected to a fitness-for-duty evaluation). The court concluded that the employer's admission was not direct evidence of discrimination "because it must be inferred or presumed that the evaluation was administered, or the action was taken, due to the employee's

disability and not solely because of an inability to perform the job's essential functions safely." *Id.* at *5–6.

Thus, the Court finds that Bibbs has not offered direct evidence of discriminatory intent. *See Clark*, 952 F.3d at 579; *Vasquez*, 2024 WL 4312257, at *5–6. Thus, the Court proceeds under the burden-shifting framework. *LHC Grp., Inc.*, 773 F.3d at 694.

### b. Prima Facie Case

To establish a prima facie case of discrimination under the ADA, the plaintiff must demonstrate "(1) that [s]he has a disability; (2) that [s]he was qualified for the job; (3) that [s]he was subject to an adverse employment decision on account of [her] disability." *Zenor v. El Paso Healthcare Sys., Ltd.*, 176 F.3d 847, 853 (5th Cir. 1999) (citing *Robertson v. Neuromedical Ctr.*, 161 F.3d 292, 294 (5th Cir. 1998) (per curiam)); *see also Dabbasi v. Motiva Enters., LLC*, 107 F.4th 500, 508 (5th Cir. 2024) (saying the same); *LHC Grp.*, 773 F.3d at 697 (saying the same).[10] Here, Motiva does not dispute that Bibbs had a disability and that he suffered an adverse employment decision. *See* [Dkt. 14 at 28–31]. Instead, Motiva asserts that Bibbs cannot establish a prima facie case of discrimination because he

---

[10] The Fifth Circuit in *LHC Group* provided an in-depth review of the elements required for a plaintiff to prove a prima facie case of discrimination under the ADA. 773 F.3d at 695–97. It stated that the Fifth Circuit's case law clearly requires a plaintiff to demonstrate that (1) she has a disability and (2) she is qualified for the job she held. *Id.* at 695. From there, however, the cases "splinter into three distinct lines regarding causal nexus." *Id.*

First, as in *Zenor*, the plaintiff must prove that "he was subject to an adverse employment decision on account of his disability." *Id.* (citing *Zenor*, 176 F.3d at 853 and then citing *Chiari v. City of League City*, 920 F.2d 311 (5th Cir. 1991)). Second, some cases require the plaintiff to prove that she "was subject to an adverse employment decision" and that she "was replaced by a non-disabled person or was treated less favorably than non-disabled employees." *Id.* (quoting *Burch v. Coca-Cola Co.*, 119 F.3d 305, 320 (5th Cir. 1997)). Finally, some cases require the plaintiff to prove causation twice by demonstrating that she "was subjected to an adverse employment action on account of her disability or the perception of her disability" and that she "was replaced by or treated less favorably than non-disabled employees." *Id.* (quoting *E.E.O.C. v. Chevron Phillips Chem. Co.*, 570 F.3d 606, 615 (5th Cir. 2009)).

The Fifth Circuit in *LHC Group* ultimately used the first formulation for several reasons: (1) it was the first formulation in the disability-discrimination context, (2) the second test was imported from a discriminatory hiring—not termination—case, (3) it is in-line with the other sister Circuits, and (4) the third formulation requires proving causation twice. *Id.* at 695–97.

Because of the Fifth Circuit's reasoning, the Court applies the *Zenor* test to determine whether Teal has alleged a prima facie case of discrimination under the ADA.

"cannot establish that he was a 'qualified individual,' and therefore entitled to the protections of the ADA." *Id.* at 29.

The ADA defines a "qualified individual" as someone "who, with or without reasonable accommodation, can perform the essential functions of the employment position that such individual holds or desires." 42 U.S.C. § 12111(8). To avoid summary judgment, the plaintiff must show that he was "qualified at the time of his termination." *Clark*, 952 F.3d at 582 (quotation and citation omitted). "The determination of qualification is two-fold: (1) whether the individual meets the necessary prerequisites for the job, such as education, experience, skills, and the like; and (2) whether the individual can perform the essential job functions, with or without reasonable accommodation." *Foreman v. Babcock & Wilcox Co.*, 117 F.3d 800, 810 n.14 (5th Cir. 1997) (referencing 42 U.S.C. § 12111(8); 29 C.F.R. § 1630.2(m) (1994)). Thus, for the second prong, the plaintiff must demonstrate either (1) he "could 'perform the essential functions of the job in spite of his disability,' or, if she could not, (2) that 'a reasonable accommodation of his disability would have enabled him to perform the essential functions of the job.'" *LHC Grp.*, 773 F.3d at 697 (alterations in the original) (quoting *Turco v. Hoechst Celanse Corp.*, 101 F.3d 1090, 1093 (5th Cir. 1996) (per curiam); *see also Weber v. BNSF Ry. Co.*, 989 F.3d 320, 324 (5th Cir. 2021) (quoting *Turco*, 101 F.3d at 1093).

Here, Motiva does not dispute whether Bibbs possessed the "necessary prerequisites" to qualify for his different job roles. [Dkt. 14 at 29]. It argues, however, that he was not qualified because he was unable to perform the essential functions of his job with or without reasonable accommodations. *Id.* Thus, the Court must decide if there is a genuine issue of material fact as to whether Bibbs could perform the essential functions of his job despite his disability or if a reasonable accommodation would have enabled him to perform the essential functions of his job. *See LHC Grp.*, 773 F.3d at 697.

A function is "essential" if it "bear[s] more than a marginal relationship to the job at issue." *Chandler v. City of Dall.*, 2 F.3d 1385, 1393 (5th Cir. 1993), *holding modified on other grounds as discussed in Kapche v. City of San Antonio*, 304 F.3d 493 (5th Cir. 2002) (citing *Chiari*, 920 F.2d at

315). The ADA requires courts to consider "the employer's judgment as to what functions of a job are essential, and if an employer has prepared a written description before advertising or interviewing applicants for the job, this description shall be considered evidence of the essential functions of the job." 42 U.S.C. § 12111(8); *see also Giles v. Gen. Elec. Co.*, 245 F.3d 474, 486 (5th Cir. 2001).

To determine whether an employee is "qualified" under the ADA, the Court must also consider whether an employee would be able to perform the essential functions of her job with a reasonable accommodation. 42 U.S.C. § 12111(8). Under the ADA, a "reasonable accommodation" may include "job restructuring, part-time or modified work schedules, reassignment to a vacant position, acquisition or modification of equipment or devices, appropriate adjustment or modifications of examinations, training materials or policies, the provision of qualified readers or interpreters, and other similar accommodations for individuals with disabilities." *Id.* § 12111(9)(B). An employer who does not provide a reasonable accommodation for its employee is liable under the ADA unless it "can demonstrate that the accommodation would impose an undue hardship on the operation of" the employer's business. 42 U.S.C. § 12112(b)(5)(A); *see also Chevron Phillips*, 570 F.3d at 613–14. An "undue hardship" is "an action requiring significant difficulty or expense." 42 U.S.C. § 12111(10)(A). "The ADA does not require an employer to relieve an employee of any essential functions of his or her job, modify those duties, reassign existing employees to perform those jobs, or hire new employees to do so." *Burch v. City of Nacogdoches*, 174 F.3d 615, 621 (5th Cir. 1999) (citations omitted); *see also LHC Grp.*, 773 F.3d at 698.

Here, Motiva argues that Bibbs was not qualified because he could not perform the essential functions of the job with or without an accommodation. [Dkt. 14 at 29]. In support of this assertion, Motiva cites its job description for a Process Operator. [Dkt. 14-18]. In the overview, the job description states that a "Process Operator is responsible for monitoring, controlling, and conducting activities that pertain to unit operation and taking corrective action when necessary to ensure that all unit conditions and operations are in compliance with Motiva safety, environmental, and operating

policies and procedures." *Id.* at 2. More specific responsibilities include "monitor[ing], adjust[ing], and record[ing] process variables as required to ensure safe, reliable, and environmentally complaint operations." *Id.* Furthermore, Motiva provides evidence indicating that a Process Operator/Pumper must be able to read and process information in emergency and non-emergency situations. *See* [Dkt. 14-10 at 5 (Bibbs's job description provided to Larnette that indicates the occasional "frequency of stressful situations necessary to perform the job")]. Larnette's evaluation of Bibbs indicated that Bibbs had difficulty "grasping information." [Dkt. 14-9 at 6]. And, Dr. Knox concluded:

> Neurocognitively, Mr. Bibbs function[s] best in a routine, repetitive, and structured environment. He may require additional training when learning new tasks. He should continue to receive accommodations for reading. He should also receive additional supervision until he demonstrates mastery over a procedure. *I would be hesitant to place him in a role that could potentially result in significant injury to himself or others and/or a role that could cause significant financial loss for Motiva Enterprises. He would also likely have difficulties processing complex information quickly and both normal and in high pressure situations such as emergencies.*

[Dkt. 14-15 at 7] (emphasis added). Motiva further indicated that Dr. Knox's suggestion that Bibbs receive "accommodations for reading" would have required Motiva "to either relieve Bibbs of specific essential functions of his position, reassign existing employees to perform those functions for him, or potentially hire new employees to do so[.]" [Dkt. 14 at 30].[11]

In response, Bibbs asserts that "absent the neuropsychological evaluation and its results, there is no dispute that Mr. Bibbs remained 'qualified' to perform the Operator position's essential functions absent any accommodation." [Dkt. 22 at 35]. However, Bibbs does not cite to anything on the record to substantiate that claim. *Id.* "[C]onclusory or unsubstantiated assertions such as those without evidence in support are not competent summary judgment evidence and are insufficient to create

---

[11] Motiva does not cite any evidence supporting this assertion. *Id.* However, Bibbs similarly does not address Motiva's assertion or create a genuine issue of material fact with evidence demonstrating that a reasonable accommodation was available. *See* [Dkt. 22 at 35]. Under Federal Rule of Civil Procedure 56(e), if a party that "fails to properly support an assertion of fact or fails to properly address another party's assertion," the court may "consider the fact undisputed for purposes of the motion." Fed. R. Civ. P. 56(e)(2). Because Motiva failed to support its assertion and Bibbs did not address it, the Court considers Motiva's assertion "undisputed." *Id.*

a genuine dispute of material fact." *Holmes v. N. Tex. Health Care Laundry Cooperative Ass'n*, 304 F. Supp. 3d 525, 540 (N.D. Tex. 2018) (citations omitted). It appears to the Court that Bibbs hangs his hat on the fact that he was subjected to an improper medical examination, as he does not discuss whether he can establish a prima facie case of discriminatory termination. *See* [Dkt. 22 at 35].

Therefore, because Bibbs does not discuss whether he is able to establish a prima facie case of discriminatory termination, the Court finds that Bibbs fails to create a genuine issue of material fact on this claim. *See Zenor*, 176 F.3d at 853; *DIRECTV*, 420 F.3d at 536. Further, because Bibbs has not demonstrated a prima facie case of discrimination, the Court need not engage in the burden-shifting analysis. *See LHC Grp.*, 773 F.3d at 694 (discussing the burden-shifting framework).

Accordingly, the Court grants summary judgment on Bibbs's discriminatory termination claim.

## B.  Retaliation

Motiva argues that summary judgment is appropriate for Bibbs's retaliation claim under the ADA because he failed to exhaust administrative remedies, or in the alternative, it fails as a matter of law because he cannot prove a prima facie case of retaliation. [Dkt. 14 at 33–36].[12]

### i.    Failure to Exhaust Administrative Remedies

The ADA prohibits an employer from retaliating against an employee for exercising or enjoying a right protected by the statute. *See* 42 U.S.C. § 12203(a)–(b). "Employment discrimination plaintiffs must exhaust administrative remedies before pursuing claims in federal court." *Taylor v. Books A Million, Inc.*, 296 F.3d 376, 378–79 (5th Cir. 2002). To exhaust administrative remedies, the plaintiff must "file[] a timely charge with the EEOC and receive[] a statutory notice of right to sue." *Id.* at 379 (citing *Dao v. Auchan Hypermarket*, 96 F.3d 787, 788–89 (5th Cir. 1996)). One of the exhaustion requirement's "central purposes . . . is to put employers on notice of 'the existence and nature of the charges against them.'" *Manning v. Chevron Chem. Co.*, 332 F.3d 874, 878 (5th Cir.

---

[12] Bibbs withdrew his retaliation claim under the Texas Labor Code with respect to retaliation. [Dkt. 22 at 36 n.11].

2003) (quoting *EEOC v. Shell Oil Co.*, 466 U.S. 54, 77 (1984)). "In determining whether a plaintiff has exhausted a particular claim, 'the scope of an EEOC complaint should be construed liberally.'" *Jennings v. Towers Watson*, 11 F.4th 335, 342 (5th Cir. 2021) (quoting *Patton v. Jacobs Eng'g Grp., Inc.*, 874 F.3d 437, 443 (5th Cir. 2017) (quoting *Pacheco v. Mineta*, 448 F.3d 783, 788 (5th Cir. 2017))). The scope of a plaintiff's complaint "is limited to the scope of the EEOC investigation which can reasonably be expected to grow out of the charge of discrimination." *Thomas v. Tex. Dep't Crim. Just.*, 220 F.3d 389, 395 (5th Cir. 2000) (citing *Young v. City of Hous.*, 906 F.2d 177, 179 (5th Cir. 1990)) (finding that the district court abused its discretion when it permitted a race discrimination claim under Title VII when the EEOC charge dealt with only gender discrimination).

As a matter of principle, different claims under the ADA (e.g., disparate treatment, retaliation, failure to accommodate) "represent distinct categories of disability discrimination under the ADA." *Hamar v. Ashland, Inc.*, 211 F. App'x 309, 310 (5th Cir. 2006) (per curiam) ("The EEOC could not reasonably have been expected, when presented with a claim alleging disparate treatment arising on August 29, 2003, to investigate the entirely distinct failure-to-accommodate claim arising from January 2003 through June of 2003."). Thus, to properly exhaust administrative remedies, the plaintiff must provide specific facts that support each claim that would trigger the EEOC to investigate each claim. *See, e.g.*, *Pacheco*, 448 F.3d at 789 ("We engage in fact-intensive analysis of the statement given by the plaintiff in the administrative charge, and look slightly beyond its four corners, to its substance rather than its label.").

Although failing to check a box on the EEOC charge is not fatal to a retaliation claim, "[d]iscrimination and retaliation claims are distinct," and a court may find that a plaintiff did not exhaust administrative remedies when "the factual statement in [the plaintiff's] EEOC charge did not put [the defendant] on notice that [the plaintiff] was asserting a retaliation claim." *Frazier v. Sabine River Auth. La.*, 509 F. App'x 370, 374 (5th Cir. 2013) (per curiam). Similarly, merely checking the box for retaliation on the EEOC charge is not sufficient if the plaintiff fails to allege any facts

concerning retaliation that would have put the EEOC on notice about the possibility of a retaliation claim. *See Givs v. City of Eunice*, 512 F. Supp. 2d 522, 536–37 (W.D. La. 2007) (citing *Randel v. U.S. Dep't of Navy*, 157 F.3d 392, 395 (5th Cir. 1998)). A court found that the plaintiff failed to exhaust administrative remedies for disability discrimination because she "summarily state[d] that she believed that she was discriminated against based on disability in violation of the ADA," without providing facts supporting a claim of disability discrimination in either her EEOC charge or her complaint with the court. *Jones v. City of Dall.*, No. 3:22-cv-1477-L, 2024 WL 3207030, at *6 (N.D. Tex. June 6, 2024), *report and recommendation adopted* 2024 WL 3718064 (N.D. Tex. Aug. 7, 2024). In contrast, the Fifth Circuit found that the plaintiff properly exhausted her administrative remedies for retaliation claims when the plaintiff alleged that she was denied reasonable accommodations and then was terminated five days later by her employer. *Williams v. Tarrant Cnty. Coll. Dist.*, 717 F. App'x 440, 445 (5th Cir. 2018) (per curiam). There, the court found that the plaintiff exhausted her administrative remedies despite not checking the retaliation box or even mentioning "retaliation" in her charge because she described the general nature of her retaliation claim. *Id.* at 446.

Here, Motiva argues that Bibbs failed to exhaust his administrative remedies because he failed to "allege a single fact in his Charge of Discrimination indicating any *retaliatory* conduct by Motiva" and "alleged no facts to link his termination (or any adverse employment action) to any protected conduct in which he purports to have engaged." [Dkt. 14 at 33 (emphasis in original)]. Bibbs argues that he properly exhausted administrative remedies because he stated in his Charge of Discrimination that he requested a reasonable accommodation and was later terminated by Motiva. [Dkt. 22 at 36].

Bibbs checked the box for "retaliation" and "disability" in his EEOC Charge. [Dkt. 14-19 at 2]. He described the course of events leading to his termination, including that he "submitted a formal request for accommodation under the [ADA]" on August 19, 2022, that Motiva "did not provide any testing accommodations," and that Motiva "terminated Mr. Bibbs['s] employment on November 17, 2022." *Id.* at 3. These factual allegations are analogous to the plaintiff's factual allegations in *Williams*,

where the court found that she properly exhausted her administrative remedies. Although Bibbs does not once mention any "retaliation" in his description of the EEOC Charge, the Court should "not require a 'plaintiff [to] check a certain box or recite a specific incantation to exhaust'" his administrative remedies just because he "'fail[ed] to articulate correctly the legal conclusion emanating from [his] factual allegations.'" *Williams*, 717 F. App'x at 445 (first quoting *Pacheco*, 448 F.3d at 792 and then *Sanchez v. Standard Brands, Inc.*, 431 F.2d 455, 467 (5th Cir. 1970)). Unlike *Frazier*, *Givs*, and *Jones*—where the plaintiffs alleged generalized facts and conclusory statements of certain EEOC claims—Bibbs here provided specific facts that trace his termination back to his initial request for an accommodation.

In construing Bibbs's EEOC Charge liberally, *Jennings*, 11 F.4th 342, although his description does not explicitly name a retaliation claim, Bibbs alleged facts that would place the EEOC on notice of it, as did the plaintiff in *Williams*.

Thus, the Court concludes that Bibbs properly exhausted his administrative remedies.

### ii.    Prima Facie Case of Retaliation

Like discrimination claims under the ADA, in the absence of direct evidence of unlawful retaliation, courts apply the burden-shifting scheme established in *McDonnell*. *Lyons v. Katy Indep. Sch. Dist.*, 964 F.3d 298, 304 (5th Cir. 2020). First, the employee must demonstrate a prima facie case of retaliation. *Id.* "If the employee establishes a prima facie case of retaliation, the employer must come forward with a legitimate, nondiscriminatory reason for its action." *Id.* (citing *Nall v. BNSF Ry. Co.*, 917 F.3d 335, 349 (5th Cir. 2019)). "If the employer meets its burden of production, the employee must then demonstrate that the proffered reason is a pretext for retaliation." *Id.* (citing *Nall*, 916 F.3d at 349). Here, Bibbs does not assert that he has direct evidence of unlawful retaliation. *See* [Dkt. 22 at 36–37]. Thus, the Court proceeds to the *McDonnell* framework.

To establish a prima facie case of retaliation under the ADA, the plaintiff must prove: "(1) []he engaged in an activity protected by the ADA, (2) []he suffered an adverse employment action, and (3)

there is a causal connection between the protected activity and the adverse action." *Lyons*, 964 F.3d at 304 (citing *Nall*, 917 F.3d at 348). Motiva argues that Bibbs cannot establish a prima facie case of retaliation because he cannot prove third element of causation. [Dkt. 14 at 34].[13]  To establish a causal link, "a plaintiff must demonstrate that the employer's decision 'was based in part on knowledge of the employee's protected activity.'" *Lyons*, 964 F.3d at 305 (quoting *Medina v. Ramsey Steel Co.*, 238 F.3d 674, 684 (5th Cir. 2001)); *see also Clark*, 952 F.3d at 588–89. In other words, to avoid summary judgment, "the plaintiff must show 'a conflict in substantial evidence' on the question of whether the employer would not have taken action 'but for' the protected activity." *Feist v. La. Dep't Just, Off. Att'y Gen.*, 730 F.3d 450, 454 (5th Cir. 2013) (quoting *Long v. Eastfield Coll.*, 88 F.3d 300, 308 (5th Cir. 1996)).

Here, Motiva argues that its decision to terminate Bibbs was not caused by his request for an accommodation, but it was instead based on observations of his work performance and information received from Bibbs, Larnette, and Dr. Knox that he could not perform the essential functions of his job, with or without reasonable accommodations. [Dkt. 14 at 35]. More specifically, Motiva primarily based its decision on Dr. Knox, a "credentialed specialist in the field of Bibbs's self-identified disability, concluding that in addition to being unable to perform the essential functions of his role," that he would be "hesitant to place [Bibbs] in a role that could potentially result in significant injury to himself or others and/or a role that could cause significant financial loss for Motiva Enterprises." *Id.*; *see also* [Dkt. 14-15 at 7 (Dr. Knox's evaluation)]. Dr. Knox also stated that Bibbs "would also likely have difficulties processing complex information quickly and both normal and in high pressure situations such as emergencies." [Dkt. 14-15 at 7].

---

[13] Motiva contends that its decision to send Bibbs for a medical examination was not an adverse employment action. *See id.* at 34–35. Even assuming accordingly, termination clearly is an adverse employment action. *See Clark*, 952 F.3d at 588 ("Clark easily satisfied prong two of the prima facie case: He suffered an adverse employment action when he was fired.").

In response, Bibbs contends the evidence "presents a direct line from [his] initial request for a testing accommodation[] in the classroom in August 2022, to his termination in November 2022. [Dkt. 22 at 37]. Hicks admitted that she would have required Bibbs to undergo Dr. Knox's evaluation regardless of whether his mistake during the hands-on test occurred. [Dkt. 22-1 at 123]. In fact, when asked why Bibbs was sent to Dr. Knox, she stated, "Because he had provided us a medical accommodation request that we needed additional information on to determine if we could accommodate his request." *Id.* However, as discussed above, Motiva did not improperly subject Bibbs to a medical examination under the ADA. The Court finds that the lawful medical examination breaks the chain of causation for purposes of retaliation because it is not entirely clear to the Court whether Motiva would have terminated Bibbs "but for" the accommodation as there is no evidence that Motiva stepped out of line in pursuing the accommodations process. *See Feist*, 730 F.3d at 454.

Even if the proper medical examination did not break the chain of causation, Motiva offered a legitimate, nondiscriminatory reason for termination, namely its reliance on Dr. Knox's evaluation. *See Lyons*, 964 F.3d at 304. An employer's decision to terminate an employee because he cannot perform the essential functions of his job is a legitimate, nondiscriminatory reason for termination. *See Smith v. Rockwell Int'l Corp.*, 77 F.3d 473, 473 (5th Cir. 1995) (per curiam) (finding that the employer offered a legitimate, nondiscriminatory reason for an adverse employment decision because the employee's doctors imposed "permanent medical restrictions on his activities that precluded him from performing the material duties of his position"); *Wilkerson v. Boomerang Tube, LLC*, No. 1:12-cv-198, 2014 WL 5282242, at *16 n.12 (E.D. Tex. Oct. 15, 2014) (stating that "an employer is permitted to terminate an employee who is unable to perform the essential functions of his job"); *Richards v. Seariver Maritime Fin. Holdings, Inc.*, 59 F. Supp. 2d 616, 632–33 (S.D. Tex. 1998), *aff'd* 189 F.3d 467 (5th Cir. 1999) (finding that the employer articulated a legitimate, non-discriminatory reason for terminating the employee because he could not perform the essential functions of his job and the

employer could not reasonably accommodate him). Therefore, Motiva's decision to terminate Bibbs based on Dr. Knox's evaluation was legitimate and nondiscriminatory.

The burden shifts to Bibbs to demonstrate that Motiva's reasoning was pretextual. *Lyons*, 964 F.3d at 306. In his response, Bibbs does not mention "pretext" or offer evidence demonstrating that Motiva's proffered reason for termination was pretextual. [Dkt. 22 at 36–37]. Therefore, Bibbs "fails to meet [his] burden on summary judgment to demonstrate that there is a dispute of fact whether [Motiva's] stated reasons for its actions were pretextual." *Lyons*, 964 F.3d at 306–07.

Accordingly, the Court grants summary judgment on Bibbs's ADA retaliation claim.

## IV.    CONCLUSION

It is therefore **ORDERED** that Bibbs's Motion for Summary Judgment [Dkt. 13] is **DENIED**.

It is further **ORDERED** that Motiva's Motion for Summary [Dkt. 14] is **GRANTED**.

It is further **ORDERED** that all Court dates and deadlines are hereby **VACATED** and that all pending motions herein are **DENIED AS MOOT**.

This constitutes a **FINAL JUDGMENT**, and the Clerk is **INSTRUCTED** to close this matter.

**SIGNED this 20th day of November, 2024.**

*Michael J. Truncale*
_____
Michael J. Truncale
United States District Judge